**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

MICHAEL KATTAWAR; and MICHAEL ）
KATTAWAR, SR., ）
）
      **Plaintiffs,** ）
）      **No. 14-2701-STA-cgc**
v. ）
）
LOGISTICS AND DISTRIBUTION ）
SERVICES, INC; and ROSS KLINE, ）
）
      **Defendants.** ）

---

## ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION TO DISMISS

---

Before the Court is Plaintiffs/Counter Defendants Michael Kattawar and Michael Kattawar, Sr.'s Motion to Dismiss Counterclaims (ECF No. 45) filed on March 16, 2015. Defendant/Counterclaimant Logistics and Distribution Services, Inc. filed a response in opposition, and Plaintiffs have filed a reply. For the reasons set forth below, Plaintiffs' Motion to Dismiss is **GRANTED in part, DENIED in part**.

## BACKGROUND

On September 11, 2014, Plaintiffs Michael Kattawar and Michael Kattawar, Sr. filed a Complaint alleging breach of contract, unjust enrichment, and negligent misrepresentation against Defendants Logistics and Distribution Services, Inc. and Ross Kline. On February 6, 2015, the Court granted in part and denied in part Defendants' Rule 12(b)(6) motion to dismiss. On February 20, 2015, Defendants filed an Answer to the Complaint and Logistics pleaded a Counterclaim (ECF No. 38). The Kattawars' Motion to Dismiss the Counterclaim followed. For

purposes of the Motion to Dismiss, the Court accepts the following well-pleaded factual allegations of the Counterclaim as true.

Counterclaimant Logistics Distribution Service ("Logistics") is a Nevada corporation, operating as a logistics and trucking company in Reno, Nevada. (Countercl. ¶ 1.) Prior to March 2013, Logistics had contracted with Eagle Worldwide Transportation LLC ("Eagle") for trucking services. (*Id.* ¶ 7.) Eagle was owned and operated by Counterdefendants Michael Kattawar and Michael Kattawar, Sr. (collectively, "the Kattawars"). (*Id.*)[1] In October 2012, Logistics retained consultant William Wiley ("Wiley") to assist Logistics in its efforts to expand into new markets. (*Id.* ¶ 8.)

Wiley had a prior relationship with the Kattawars and in early 2013, began talking to the Kattawars (along with Jerry Kattawar) about Eagle's possible interest in a deal with Logistics. (*Id.* ¶ 9.) On or about March 19, 2013, the Kattawars provided Wiley with what they represented were true and accurate profit and loss statements for Eagle from the preceding 12 months (February 2012 to January 2013). (*Id.* ¶ 10.) The Kattawars knew that Logistics sought the profit and loss statements so that Logistics could have an understanding of the profitability of Eagle and use the information during a possible negotiation of the purchase of part or all of the company and its assets. (*Id.*) The profit and loss statements showed profits for each of Eagle's three divisions (Truckload, Flatbed, and Special Hall) and represented that Eagle's total revenue exceeded its expenses by $900,000. (*Id.*) Also, on or about March 19, 2013, Michael Kattawar represented to Wiley that Eagle had 49 total drivers working at an average rate of around $1.90 per mile. (*Id.* ¶ 11.)

---

[1] Kattawar was then the president of Eagle, and Kattawar Sr. was a member of the company. (Countercl. ¶ 7.)

Based on the profit and loss statements provided by the Kattawars, Wiley valued Eagle's worth at between $1 million and $1.5 million. (*Id.* ¶12.) On April 9, 2013, the Kattawars proposed that Logistics acquire 40% of Eagle for $350,000 and that for a period of 12 months, Michael Kattawar would earn a salary from Eagle of $27,000 per month. (*Id*. ¶ 13.) In exchange Kattawar would work to increase business for Eagle. (*Id.*) Later, on April 19, 2013, Michael Kattawar supplied Logistics with information about Eagle's equipment. (*Id.* ¶ 14.)

On April 25, 2013, Ross Kline ("Kline") and Wiley met with Michael Kattawar and Jerry Kattawar to further discuss a potential deal between Logistics and Eagle. (*Id.* ¶ 15.) Between April 25 and May 1, 2013, Kline and Michael Kattawar continued to discuss the terms of a possible deal between Logistics and Eagle, including options for Logistics's purchase of or merger with Eagle as well as Logistics's purchase of Eagle's assets and goodwill. (*Id.* ¶ 16.) During these conversations, Michael Kattawar represented that Eagle was profitable and had a good reputation in Tennessee. (*Id.* ¶ 17.) Kattawar provided Kline with financial figures relating to Eagle and represented that with Kattawar's assistance Logistics could operate at similar rates in Tennessee. (*Id.*) Kattawar helped Kline prepare a proposed budget for the deal based on Logistics's operations in Tennessee so that Kline could seek funding from Logistics's bank. (*Id.*)

On May 2, 2013, Michael Kattawar told Kline that based on advice from his accountant and in order to maximize his tax advantages, he preferred to structure the transaction as a purchase of Eagle's assets and goodwill. (*Id.* ¶ 18.) Consistent with the Kattawars' request for an asset and goodwill purchase, on May 6, 2013, Logistics offered to purchase Eagle's assets for $300,000, with payments to be made over several months. (*Id.* ¶ 19.) The agreement would

include Logistics's assumption of certain leases for trailers and trucks.  (*Id.*)  Logistics also offered that to retain the Kattawars as consultants for a period of 60 months so that the Kattawars could "provid[e] sales support" to Logistics.  (*Id.* ¶ 20.)  Logistics noted that the consulting payments would be income and that the Kattawars would be responsible for their income taxes. (*Id.*) Logistics planned to present the deal to its bank and then make a formal offer if and when the bank approved the transaction. (*Id.*)  Ten minutes after Logistics communicated its offer, Michael Kattawar confirmed that the offer was consistent with the parties' discussions and agreement. (*Id.* ¶ 21.) Kattawar also represented that as a consultant, he would assist Logistics in sales support in "truckload," presumably a reference to Eagle's truckload division. (*Id.*)

As the negotiations continued, Logistics received additional financial disclosures from the Kattawars and forward the information to its bank, Bank of America.  On or about May 10, 2013, the Kattawars provided Logistics with Eagle's 2012 income statement, reflecting $1,202,647.67 in profits. (*Id.* ¶ 22.)  On May 13, 2013, the Kattawars produced copies of Eagle's trailer leases as well as what purported to be Eagle's profit and loss statement for March 2013, showing Eagle had $15,443.34 in losses. (*Id.* ¶¶ 23, 24.)  On May 15, 2013, Logistics submitted projections to Bank of America, forecasting its potential operations in Tennessee after its acquisition of Eagle's assets, all based on financial disclosures from Michael Kattawar. (*Id.* ¶ 25.)  On May 16, 2013, Logistics notified Bank of America that the purchase was an asset sale, not an acquisition, and that the majority of the sales price was designated for goodwill. (*Id.* ¶ 26.) Shortly thereafter, Bank of America agreed to lend Logistics the funding for its purchase of Eagle's assets, goodwill, and operations. (*Id.* ¶ 27.)

Thereafter, Logistics and Eagle began negotiating the final form of an Asset Purchase Agreement ("the purchase agreement"). (*Id.* ¶ 28.) On or about June 27, 2013, the parties entered

into a purchase agreement under substantially the same terms agreed to by Michael Kattawar and Kline back on May 2, 2013. (*Id.* ¶ 29.) Pursuant to the purchase agreement, Logistics was to acquire five semi-tractors and trailers, Eagle's inventory, Eagle's rights under certain semi-tractor and trailer rental agreements, and all goodwill associated with Eagle's trade name and trademarks (collectively, the "assets"). (*Id.* ¶ 30.) Logistics did not, however, acquire Eagle's accounts receivable, prepaid expenses, insurance policies, cash, or cash equivalents. (*Id.*) In aggregate consideration for the assets, Logistics paid the sum of $300,000.00. As part of the purchase agreement, the Kattawars and Eagle made the following warranties:

(a) they had provided true and complete copies of Eagle's audited financials to Logistics prior to closing;

(b) they had provided Eagle's audited balance sheets as of April 30, 2013, which had been prepared in accordance with generally accepted accounting principles.

(c) their financial statements "fairly present[ed] the financial position, assets and liabilities . . . of Seller at the dates indicated, and such statements of income, cash flow and changes in members' equity fairly present[ed] the results of operations, cash flow and changes in members' equity of Seller";

(d) "[t]he books, records and accounts of Seller maintained with respect to the Business accurately and fairly reflect in all material respects, in reasonable detail, the Assets and Liabilities of the Business. Seller has not engaged in any transaction with respect to the Business, maintained any bank account for the Business or used any of the funds of Seller in the conduct of the Business except for transactions, bank accounts and funds that have been and are reflected in the books and records of the Business";

(e) since April 2013, Eagle had not incurred any additional liabilities and no material adverse event had occurred;

(f) there had been no material change to any customer relationships or vendor relationships; (*Id.* ¶ 31.) and

(g) they had made all necessary and required contributions to Eagle's employee benefit plans. (*Id.* ¶ 32.)

As part of the goodwill purchased by Logistics, the Kattawars and Eagle warranted that Eagle would cause a minimum of 42 drivers to contract directly with or accept employment from Logistics as qualified drivers. (*Id.* ¶ 33.) Failure to do so would result in a decrease to any consulting payments made to the Kattawars. (*Id.*)

In July 2013, Logistics sent representatives to Eagle's offices in Memphis, Tennessee to conduct due diligences. (*Id.* ¶ 34.) The Kattawars directed Eagle employee Lee Johnson ("Johnson") to produce certain financial records for Logistics during the due diligence phase, including an expense report showing that Eagle had reported $521,898 in expenses for April 2013. (*Id.* ¶ 35.) On July 24, 2013, and August 9, 2013, Logistics, the Kattawars, and Eagle executed amendments to the purchase agreement to extend the closing date and allow additional time for due diligence. (*Id.* ¶ 36.) On August 19, 2013, the Kattawars entered into separate consulting agreements with Logistics. (*Id.* ¶ 37.) The consulting agreements included no-compete clauses prohibiting the Kattawars from competing with Logistics or engaging in any behavior that would impair Eagle's value. (*Id.*) The Kattawars agreed to advise Logistics, refer shippers to Logistics, and assist Logistics in maintaining relationships with Eagle's customers, vendors, employees, and drivers. (*Id.*) The parties subsequently executed another amendment to the purchasing agreement, which addressed the offset of any payments due under the consulting

agreements for the cost of repair to Eagle's assets or a reduction in the number of qualified drivers at the time of closing. (*Id.* ¶ 38.)

On or about August 20, 2013, the parties closed on the purchase agreement. (*Id.* ¶ 39.) The $300,000 purchase price paid by Logistics was allocated as follows: $102,000 for five trucks or trailers; $1,000 for office equipment; $197,000 for Eagle's goodwill. (*Id.*) Logistics also assumed $17,666.76 in driver vacation accruals. (*Id.*) At closing, Michael Kattawar entered into a "phantom ownership interest agreement," capping his consulting payments at $507,600.00. (*Id.* ¶ 40.) Together with other reductions in amounts due under the consulting agreements, the total net fees payable to the Kattawars over 60 months was $743,000.00. (*Id.*)

Immediately upon closing, it became clear to Logistics that the Kattawars and Eagle had misrepresented the viability of the company and the value of its goodwill. (*Id.* ¶ 41.) While the Kattawars had described Eagle as a profitable business, in reality Eagle did not make payroll. (*Id.*) Logistics also learned that subsequent to closing, the Kattawars had siphoned off any accounts receivable to the detriment of Eagle's goodwill and vendors. (*Id.*) Logistics discovered that the financial disclosures it had received from the Kattawars were inaccurate. For example, on March 19, 2013, the Kattawars had given Wiley Eagle's profit and loss statements for the preceding twelve months (February 2012 to January 2013), showing total revenue exceeding expenses by $900,000. (*Id.* ¶ 42.) On May 10, 2013, the Kattawars had produced Eagle's 2012 income statement, showing a profit of $1,202,647.67. (*Id.* ¶ 43.)

Likewise, the disclosures about Eagle's financial strength in 2013 were also inaccurate. On May 13, 2013, the Kattawars provided Wiley with Eagle's March 2013 profit and loss statement, showing $15,443.34 in losses. (*Id.* ¶ 48.) However, on April 26, 2013, Johnson had given the Kattawars two profit and loss statements for March 2013, one showing that Eagle lost

$126,062.42 and the other with some manipulation of the figure to make it appear "real good." (*Id.* ¶ 49.) The Kattawars knew that the disclosures were false when made and that Eagle had actually incurred losses for that year.

The Counterclaim goes on to allege additional financial difficulties facing Eagle. Logistics discovered after closing that Eagle had brought in multiple accountants in 2012 to prepare financials which would assist Eagle in obtaining bank lending. (*Id.* ¶ 45.) At that time, the Kattawars had instructed Johnson to manipulate the company's financials with false journal entries. (*Id.*)[2] By early February 2013, Eagle was in such a dire financial situation it attempted to negotiate its debt with vendors, and Michael Kattawar had suggested that any accounts receivable should be paid directly to him. (*Id.* ¶ 47.) In June 2013, Eagle began defaulting on fuel payments to Fleetone and has its credit line decreased. (*Id.* ¶ 52.) On June 12, 2013, Johnson advised the Kattawars that Eagle was in danger of not making payroll. (*Id.* ¶ 53.) Michael Kattawar put $200,000 into the company to keep it afloat and contributed $31,000 to payroll on August 1, 2013. (*Id.* ¶ 55.) According to the Counterclaim, Eagle's financial disclosures did not reflect Kattawar's capital contributions to the company. (*Id.*) Eagle also attempted to renegotiate its leases with Ryder Truck Rental, Inc. to free up funds. (*Id.* ¶ 54.)[3] On June 12, 2013, several payments were returned to Ryder for insufficient funds. (*Id.*) On August 5, 2013, Johnson informed the Kattawars that Eagle's account balances were negative $38,155.02. (*Id.* ¶ 56.) As a result, Johnson warned that Eagle's fuel account would be cut off

---

[2] The Counterclaim alleges that in January 2013, Michael Kattawar had attempted to use $18,838.27 in Eagle's funds to pay personal bills. (*Id.* ¶ 46.) This allegation does not appear to relate to any of the claims at issue in Motion to Dismiss now before the Court.

[3] Under the terms of the purchase agreement, Logistics was to assume the Ryder leases, and Ryder was considered a critical vendor. (*Id.* ¶ 57.)

and that the company would have to conceal this fact from Wiley. (*Id.*) And on September 27, 2013, Logistics received a statement from Colonial Life Insurance, regarding life insurance premiums. (*Id.* ¶ 68.) Upon information and belief, Eagle was withholding money from employees' paychecks for life insurance but failed to remit funds to the life insurance company. (*Id.* ¶ 69.)

By August 16, 2013, the Kattawars knew that Eagle had more than $630,000 in accounts receivable, of which $411,000 was more than 90 days overdue. (*Id.* ¶ 57.) On August 19, 2013, the day before escrow closed, Michael Kattawar directed Tyler Kattawar to cease paying any vendors and to deposit any money coming in for Eagle into an account at Triumph Bank, which upon information and belief, was under the control of Michael Kattawar. (*Id.* ¶ 58.) On September 5, 2013, Michael Kattawar told Johnson that he personally floated payroll for three months and that he was demanding his money be returned from any accounts receivable. (*Id.* ¶ 59.) Michael Kattawar directed that any money received for Eagle should go to Tyler Kattawar's commissions and the rest to Michael Kattawar's account at First Tennessee Bank under the account name "MK Properties." (*Id.*) Kattawar also instructed Johnson to keep her displeasure about the arrangement to herself. (*Id.*)

On September 5, 2013, Barry Bernard referred Eagle's vendors to Johnson and Tyler Kattawar for payment. (*Id.* ¶ 60.)[4] Tyler Kattawar explained that vendors were seeking payment for receivables due and owing from Eagle for more than 6 months. (*Id.*)[5] In response Michael Kattawar told Johnson and Tyler Kattawar to inform all vendors that Eagle had been dissolved

---

[4] The Counterclaim does not identify Barry Bernard further or explain what role he had in the affairs of the parties.

[5] The Counterclaim's reference to "receivables" in this paragraph appears to mean Eagle's debts to vendors, which would actually constitute Eagle's "accounts payable" and its vendors' "receivables." The wording here is somewhat unclear because elsewhere the Counterclaim refers to Eagle's "receivables" as one of Eagle's assets, and not a liability.

and that there was no money left to pay vendors. (*Id.*) On September 19, 2013, Michael Kattawar again told Johnson and Tyler Kattawar, who had both taken employment with Logistics, to stop paying Eagle's vendors and to instead divert all funds to himself. (*Id.* ¶ 61.) Kattawar, Sr. confirmed those instructions to Johnson. (*Id.*)

In addition to Eagle's financial woes, Logistics claims that Eagle also misrepresented the number of its qualified drivers. Despite Michael Kattawar's representation on March 19, 2013 that Eagle had 49 total drivers and the purchase agreement's requirement that EAGLE cause 42 qualified drivers to become employed with Logistics, Eagle did not have 42 qualified drivers prior to closing. (*Id.* ¶ 62.) On July 25, 2013, Michael Kattawar directed Sean Abel, Eagle's general manager, to begin hiring over-the-road drivers and explained that Eagle needed a total of 42 drivers immediately. (*Id.* ¶ 63.) Kattawar instructed Abel to "speed up and expedite the hiring process," even to "hand deliver paper work or drug test or pay extra to get it done." (*Id.*)

At closing the Kattawars claimed that Eagle had 44 qualified drivers. (*Id.* ¶ 64.) But by September 12, 2013, eight drivers had refused to take orders from dispatch and thus were deemed unqualified. (*Id.* ¶ 65.) Consequently, adjustments were made to the Kattawars' consulting payments. (*Id.*) In the following weeks, additional drivers became unqualified. (*Id.* ¶ 66.)[6] Within months of closing, few of Eagle's drivers were actually "qualified" as that term was used in the purchase agreement. (*Id.* ¶ 67.)

According to the Counterclaim, the Kattawars were obligated under the consulting agreements to provide consulting services to Logistics. Specifically, the Kattawars were to assist Logistics in maintaining relationships with Eagle's customers, vendors, employees, and drivers,

---

[6] The Counterclaim adds that even though more drivers were not qualified, they "were not subject to offset of the consulting payments due to the terms of the APA." (*Id.* ¶ 66.) The precise meaning of this phrase is not clear to the Court.

and by referring shippers to Logistics. The consulting agreements included the following restrictive covenants:

(a) Non-Compete. The Kattawars, directly or through an affiliate, spouse, family member, or through any entity, were prohibited from engaging in the business of providing for-hire motor carrier services within the United States;

(b) Non-Solicitation. The Kattawars were prohibited from soliciting or contacting existing or prospective customers of Logistics or Eagle;

(c) Anti-Raiding. The Kattawars were prohibited from soliciting to recruit, hire, or attempt to hire any employee or independent contractor of Logistics or its affiliates;

(d) Nondisclosure. The Kattawars were prohibited from disclosing confidential information;

(e) Non-Disparagement. The Kattawars were prohibited from disparaging Logistics, its affiliates and employees. (*Id.* ¶ 72.)

The consulting agreements were terminable if, among other things, the Kattawars failed to fulfill their consulting duties, breached the restrictive covenants, or if Eagle or the Kattawars breached the purchase agreement. (*Id.* ¶ 73.)

Logistics alleges that the Kattawars materially neglected to perform any consulting duties. (*Id.* ¶ 74.) The Kattawars did not assist Logistics in maintaining relationships with Eagle's business customers, vendors, and employees, and instead interfered with those relationships. (*Id.*) The Kattawars diverted money from vendors for their own benefit. (*Id.*) The Kattawars also failed to maintain Logistics's relationships with drivers and failed to refer shippers to Logistics. (*Id.*) The Kattawars breached the restrictive covenants by soliciting, recruiting, and hiring Wiley to perform consulting services for them in violation of the anti-

raiding covenant. (*Id.* ¶ 75.)  Upon information and belief, the Kattawars, by and through K-Power Global Logistics, LLC and Kamo Global Logistics, LLC, engaged in business activities that violated the non-compete covenant by providing asset-based, for-hire motor carrier truckload, flatbed, special haul or refrigerated transportation services. (*Id.*)  In August 2014, Logistics terminated the consulting agreements and the non-competition agreements due to the Kattawars' non-performance. The Kattawars responded by filing a retaliatory complaint asserting breach of contract and unjust enrichment against Logistics. (*Id.* ¶ 77.)

Based on these allegations, the Counterclaim alleges the following causes of actions against the Kattawars: breach of contract and breach of the covenant of good faith and fair dealing with respect to the purchase agreement; breach of contract and breach of the covenant of good faith and fair dealing with respect to each of the Kattawar's consulting agreements; fraud in the inducement; fraudulent misrepresentation/omission; and a declaration from the Court that Logistics has the right to terminate the consulting agreements.

The Kattawars seek the partial dismissal of Logistics's Counterclaim.  Concerning the contractual claims, the Kattawars argue that any claim for breach of the implied covenant of good faith and fair dealing, whether as to the purchase agreement or the consulting agreements, is duplicative of Logistics's separate claims for breach of contract as to the purchase agreement and the consulting agreements.  According to the Kattawars, a party alleging breach of the implied covenant of good faith and fair dealing under Nevada law must allege that the breaching party complied with the express terms of a contract but violated the contract's intention and spirit.  The Counterclaim in this case does not allege that the Kattawars complied with the express terms of the parties' agreement.  On the contrary, Logistics alleges that the Kattawars

actually breached express terms of the contracts. Thus, the Counterclaim fails to state a claim for breach of the implied covenant of good faith and fair dealing.

The Kattawars also seek the dismissal of Logistics's claims for declaratory relief based on the Kattawars' alleged breach of their respective consulting agreements. The Kattawars argue that declaratory relief is a remedy, not a cause of action. As such, the Counterclaim's separately alleged claims for declaratory relief as to the consulting agreements are duplicative of Logistics' claims for breach of the consulting agreements and should be dismissed.

The Kattawars next seek dismissal of Logistics' counterclaims sounding in fraud. The Kattawars argue that under Nevada law, a party to an express agreement fails to plead a fraud claim where the alleged misrepresentation or omission contradicts the express terms of the agreement. The purchase agreement contains express representations and warranties from the Kattawars directly contradicting the Kattawars' alleged misrepresentations and omissions. For this reason alone, the Kattawars argue that the Counterclaim fails to plead either fraud claim. And with respect to Logistics's claim for fraudulent concealment, the Counterclaim fails to plead that the Kattawars had any duty to disclose. Therefore, the Court should dismiss the Counterclaim's duplicative breach of the implied covenant of good faith claims as well as the fraud claims contradicting the express terms of the parties' agreements.

Logistics has responded in opposition to the Motion to Dismiss. First, Logistics argues that the counterclaims sounding in fraud do not contradict the express terms of the parties' agreements. Logistics's fraud claims are based on its allegations that the Kattawars provided materially false information about Eagle in "direct violation of the express representations and warranties" the Kattawars made in the purchase agreement. Specifically, the Kattawars represented in the purchase agreement that they had provided accurate financial statements and

books as well as complete information about Eagle's drivers and existing liabilities, when in fact the Kattawars had not provided any of this information. Logistics further contends that the Counterclaim adequately pleads the Kattawars' duty to disclose all material information and their breach of that duty.

Second, Logistics responds that the Counterclaim states the breach of the implied covenant of good faith and fair dealing claims. The Counterclaim alleges that the Kattawars breached the implied covenant of the purchase in the following particulars: by providing disclosures required by the purchase agreement but with the knowledge that the disclosures were false or incomplete; by hiring unqualified drivers "by any means" simply to meet the purchase agreement's required number of drivers; and by failing to pay vendors after closing on the purchase agreement and instead diverting Eagle's receivables to themselves. Likewise, the Counterclaim alleges that the Kattawars breached their consulting agreements by failing to provide consulting services, by diverting Eagle's assets to their own personal use, and by hiring Wiley as their own consultant. Logistics adds that its breach of implied covenant claims are not duplicative of its breach of contract claims but rather alternative claims for relief. According to Logistics, the breach of implied covenant claims may provide alternative relief "in the event that this Court finds that the Counter-Defendants did not breach the APA" or the consulting agreements.

Finally, Logistics argues that the Kattawars' request to dismiss the Counterclaims for declaratory relief elevates form over substance. Whether the Court permits the declaratory relief Logistics seeks as separate causes of action in the Counterclaim or simply as a prayer for relief,

the Counterclaim puts the Kattawars on notice of Logistics's claim for declaratory relief.[7]  For these reasons the Court should deny the Motion to Dismiss.

The Kattawars have filed a reply, restating many of the arguments from their opening brief.  The Kattawars continue to assert that the counterclaims for breach of the implied covenant of good faith and fair dealing are nothing more than claims for breach of contract.  The Counterclaim fails to allege that the Kattawars literally performed under their agreements with Logistics.  Instead the Counterclaim bases the breach of implied covenant claims on the Kattawars' failure to comply with the express terms of the parties' contracts.  In other words, the Counterclaim alleges a breach of contract.  The Court should reject Logistics's contention that the breach of implied covenant claims are alternative claims to their breach of contract of claims.  Even if the breach of implied covenant claims are pleaded in the alternative, Logistics must still plead the elements of the breach of implied covenant claims but has failed to do so in the Counterclaim.  The Counterclaim's breach of contract allegations against the Kattawars are inconsistent with any possible alternative claim that the Kattawars also breached the implied covenants of their consulting agreements.  Specifically, the Counterclaim alleges that the Kattawars breached their consulting agreements by failing to provide consulting services.  This allegation is entirely inconsistent with any claim that the Kattawars literally fulfilled their duties under the consulting agreements but breached their implied covenant of good faith and fair dealing.  As such, the Kattawars maintain that Logistics's breach of implied covenant claims are ripe for dismissal.

---

[7] Logistics goes on to address the Kattawars' argument that some of the allegations of the Counterclaim appear to be hearsay. The Kattawars raise this point only in a single footnote and without identifying which specific allegation(s) of the Counterclaim constitutes hearsay. Without more, the Court finds no reason to address this argument further.

## STANDARD OF REVIEW

A defendant may move to dismiss a claim or counterclaim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party.[8] However, legal conclusions or unwarranted factual inferences need not be accepted as true.[9] "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim."[10] Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[11] Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[12] In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face."[13] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[8] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 6th Cir. 1992).

[9] *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

[10] *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

[11] Fed. R. Civ. P. 8(a)(2).

[12] *Ashcroft v. Iqbal,* 556 U.S. 662, 681 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). *See also Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) (quoting *Twombly,* 550 U.S. at 555).

[13] *Twombly*, 550 U.S. at 555, 570.

reasonable inference that the defendant is liable for the misconduct alleged."[14]

## ANALYSIS

### I. Breach of the Implied Covenant of Good Faith and Fair Dealing

The first issue presented is whether Logistics's Counterclaim alleges any claim for breach of the implied covenant of good faith and fair dealing. Just as the Court did in deciding Logistics's Rule 12(b)(6) motion to dismiss, the Court will assume at the pleadings stage that Nevada law governs the parties' dispute. Under Nevada law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and execution."[15] To make out a claim for breach of the implied covenant of good faith and fair dealing claim, a plaintiff must show that (1) the plaintiff and the defendant were parties to a contract, (2) the defendant owed a duty of good faith and fair dealing to the plaintiff, (3) the defendant breached his duty by performing in a manner unfaithful to the purpose of the contract, and (4) the plaintiff's justified expectations were denied.[16] The Nevada Supreme Court has held that a breach of the implied covenant of good faith occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract."[17] "Damages may be awarded against a defendant that performs a contract in a manner that is unfaithful to the contract's purpose or where a defendant deliberately contravenes the intention

---

[14] *Iqbal*, 556 U.S. at 678.

[15] *A.C. Shaw Constr. v. Washoe Cnty.*, 784 P.2d 9, 9 (1989) (*quoting* Restatement (Second) of Contracts § 205)).

[16] *Eagle SPE NV 1, Inc. v. Southern Highlands Development Corp.*, 36 F. Supp. 3d 981, 990 (D. Nev. 2014) (citing *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 2008)).

[17] *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922-23 (Nev. 1991).

and spirit of the contract, thus denying plaintiff's justified expectations."[18] In this way, a breach of the implied covenant of good faith and fair dealing claim is "duplicative" of a breach of contract claim because the implied covenant claim is "essentially a failsafe for when a defendant does not in fact violate contractual terms but treats the plaintiff unfairly under it."[19]

Logistics alleges in the Counterclaim that the Kattawars violated the implied covenant of good faith running with each of the parties' three agreements. The Court considers the alleged breaches for each contract separately.

## A. The Purchase Agreement

The Counterclaim alleges that the Kattawars violated the implied covenant of good faith in the purchase agreement in two particulars. First, in a rush to hire drivers in order to reach a goal of 42 qualified drivers before closing, the Kattawars directed their agents to hire any drivers, even underqualified drivers, on Eagle's behalf, thereby frustrating Logistics's expectations in the purchase agreement. As a general matter, the Kattawars and Eagle jointly and severally warranted that none of their representations and warranties in the purchase agreement "contain[ed] any untrue statement of a material fact."[20] Among their joint and several representations and warranties, Eagle and the Kattawars represented that Eagle "employs approximately twenty (20) employee-drivers, and is a party to lease agreements with approximately thirty (30) owner-operators."[21] And as part of this warranty, Eagle agreed to "be responsible for causing a minimum of forty-two (42) employee drivers/owner-operators to

---

[18] *Eagle SPE NV 1*, 36 F. Supp. 3d at 990 (citations omitted).

[19] *Kennedy v. Carriage Cemetery Servs., Inc.*, 727 F. Supp. 2d 925, 931 (D. Nev. 2010).

[20] APA § 3.1.31.

[21] *Id.* at § 3.1.26.

contract directly with or accept employment from [Logistics] as a 'qualified driver.'"[22] The purchase agreement defined a "qualified" driver as one who "(i) meets the U.S. Department of Transportation regulations for over-the-road truck drivers and satisfies [Logistics]'s driver standards, both as reasonably determined by [Logistics] in good faith, and (ii) accepts a dispatch from [Logistics]."[23] Notably, the purchase agreement further provided that in the event less than 42 of Eagle's drivers were determined to be "qualified" within 10 days of closing, Logistics would reduce the "aggregate" consulting payments owed to Plaintiffs under the consulting agreements by $5,000.00 for every driver for which Eagle fell short.[24]

The Court holds that in light of the terms of the purchase agreement itself, the Counterclaim fails to state a claim for breach of the implied covenant of good faith and fair dealing as to the Kattawars' efforts to hire qualified drivers. Instead of alleging that the Kattawars complied with the letter of the driver requirement but somehow violated the spirit of the requirement, Logistics merely alleges that the Kattawars failed to comply with the driver requirement. As is clear from the purchase agreement, the Kattawars represented that Eagle had employment relationships with approximately 50 drivers, either as employee-drivers or as owner-operators. The Kattawars also undertook to have at least 42 of those drivers continue as employees or contractors with Logistics once the parties had closed on the purchase of the company. Logistics now alleges that Eagle had to scramble to come up with 42 drivers, even hiring new drivers, just to ensure that 42 drivers were available by closing. And once the drivers were hired, Logistics found many to be not "qualified" as the purchase agreement defined the

---

[22] *Id.*

[23] *Id.* at § 7.8.

[24] *Id.*

term.  Put another way, Logistics alleges that the Kattawars' representation in the purchase agreement about the number of drivers employed with Eagle was false and that the Kattawars failed to ensure that Eagle employed 42 "qualified" drivers at closing, allegations which would amount to the breach of express contractual terms in the purchase agreement.  The Court concludes that under Nevada law, such allegations fail to state a claim for breach of the implied covenant of good faith and fair dealing because Logistics has actually alleged breaches of the express terms of the contract.  Therefore, the Kattawars' Motion to Dismiss is **GRANTED** as to this issue.

As the second ground for its breach of the implied covenant of good faith in the purchase agreement, Logistics alleges that the Kattawars failed to pay Eagle's vendors and instead improperly diverted Eagle's accounts receivables and used the funds for their own personal gain. In defining precisely what assets Logistics was purchasing from Eagle, the purchase agreement specifically excluded Eagle's "accounts receivable."[25]  The parties also agreed that Eagle would receive all revenue and cover all expenses for loads delivered prior to closing, and Logistics would receive all revenue and cover all expenses for loads delivered after closing.[26] Just as with Logistics's claim related to the hiring of drivers, the Court holds that Logistics's claim for failure to pay vendors and the improper diversion of funds fails to state a claim for breach of the implied covenant of good faith.  Rather than alleging that the Kattawars complied with the letter of the purchase agreement but somehow violated the spirit of the agreement, Logistics just alleges that the Kattawars failed to pay vendors as they had agreed to do.  It is not at all clear how the Kattawars improperly diverted accounts receivable when Logistics did not acquire Eagle's

---

[25] APA § 1.3.2(e).

[26] *Id.* at § 2.2

accounts receivable and the purchase agreement specifically excluded accounts receivable from the transaction. Therefore, the Kattawars' Motion to Dismiss is **GRANTED** as to this issue.

## B. The Consulting Agreements

The Kattawars next move to dismiss Logistics's claims that the Kattawars breached the implied covenant of good faith in their separate consulting agreements. The Counterclaim alleges that the Kattawars violated the implied covenant of good faith in the consulting agreements by not providing consulting services and by improperly diverting Eagle's receivables. For the reasons already discussed, the Court holds that the Counterclaim fails to state these claims. Logistics does not allege that the Kattawars literally complied with their consulting agreements; it actually alleges the opposite, that the Kattawars breached the express terms of their consulting agreements. Therefore, the Motion to Dismiss is **GRANTED** as to these claims.

The parties strongly disagree over whether Logistics's claims for breach of the implied covenant of good faith and fair dealing duplicate its breach of contract claims. In this regard the Kattawars argue that each breach of implied covenant claim "essentially restates the allegations pleaded in connection with [Logistics's] breach of contract claim" while Logistics parses the pleadings to show that the two claims are based on distinct factual allegations. The Court does not find that the breach of implied covenant claims duplicate the breach of contract counts, at least not in the sense that the two claims mirror each other. The breach of implied covenant claims do, in fact, allege factual grounds separate and apart from the factual grounds alleged to support the breach of contract claims. The problem with the Counterclaim lies in the fact that each of the facts alleged in support of the breach of implied covenant claims actually constitutes an alleged breach of the express terms of the contract. At any rate, the Court does not agree that,

strictly speaking, the breach of implied covenant claims in this case are duplicative of the breach of contract claims.

And for similar reasons, the Court rejects Logistics's argument that the breach of implied covenant claims are simply pleaded in the alternative to the breach of contract claims. Pleading alternative, inconsistent causes of action is permitted under Federal Rule of Civil Procedure 8(d)(3).[27] However, the Court finds the Counterclaim does not actually allege the breach of contract claims and the breach of the implied covenant of good faith claims as alternative, inconsistent causes of actions. Procedurally, Logistics has not pleaded the claims in such a way so as to give the Kattawars (or the Court) notice that each claim is brought as an alternative, inconsistent claim.[28] Perhaps more fundamentally, the Counterclaim fails to allege that the Kattawars literally complied with their agreements but violated the spirit of the agreements, an essential element of a breach of the implied covenant of good faith under Nevada law. For example, Logistics alleges that Eagle imprudently rushed to retain a minimum of 42 drivers and thereby failed to hire drivers who met the purchase agreement's definition of "qualified." For reasons already explained, these allegations amount to a breach of the express terms of the purchase agreement, not a plausible claim for breach of the implied covenant. Logistics also alleges that the Kattawars failed to pay Eagle's bills, damaged Eagle's goodwill with its vendors, and neglected to perform their duties as consultants. These allegations state a claim for breach of the express terms of the consulting agreements, not a breach of the implied covenant. In short, Logistics has not alleged that the Kattawars literally complied with any of the agreements but

---

[27] Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

[28] *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000) ("While [pleaders] need not use particular words to plead in the alternative, they must use a formulation from which it can be reasonably inferred that this is what they were doing.").

violated the spirit of the deal.[29]   Therefore, the Counterclaim fails to allege an alternative, inconsistent claim for breach of the purchase agreement's implied warranty of good faith.

For all of these reasons, the Kattawars' Motion to Dismiss is **GRANTED** as to any breach of the implied covenant of good faith in the parties' agreements.

## II. Fraud in the Inducement

The next issue presented is whether Logistics's Counterclaim alleges a claim for fraud in the inducement against the Kattawars.   To make out a claim for fraud in the inducement under Nevada law, a plaintiff must establish by clear and convincing evidence that (1) defendant made a false representation, (2) defendant had knowledge of the falsity of the representation, (3) defendant intended to induce plaintiff to rely on the representation, (4) plaintiff justifiably relied on the representation, and (5) plaintiff suffered damages as a result of this reliance.[30]   The Court holds that Logistics has plausibly alleged a claim for fraud in the inducement.   In support of the claim, the Counterclaim alleges that the Kattawars knowingly provided Logistics with false information about the financial health of Eagle for the purpose of inducing Logistics to purchase the company.   The specific information included profit-and-loss statements, income statements, budgets, and representations about the number of drivers with whom Eagle had an employment relationship. The Counterclaim also identifies the party who made the alleged misrepresentations and the dates on which Logistics received the allegedly fraudulent information.   Accepting these

---

[29] *Hilton Hotels Corp.*, 808 P.2d at 922-23.

[30] *Butwinick v. Hepner*, no. 56303, 2014 WL 3784111, at *1 (Nev. July 30, 2014) (citing *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (Nev. 2004)).

allegations as true, as the Court must at the pleadings stage, Logistics has carried its burden to "state a claim to relief that is plausible on its face."[31]

In their Motion to Dismiss, the Kattawars contend that under Nevada law, a claim for fraud in the inducement will not lie where the alleged misrepresentations contradict the express terms of a contract. "Misrepresentations that conflict with the terms of a writing cannot serve as the basis for a fraud claim."[32] The Nevada Supreme Court has explained that an allegedly fraudulent "inducement cannot be something that conflicts with the [written contract]'s express terms, as the terms of the contract are the embodiment of *all* oral negotiations and stipulations."[33] However, the Court finds that this rule has no application in this case. The Kattawars have not shown how the alleged misrepresentations in the Counterclaim conflict with the terms of the purchase agreement or the consulting agreements. Logistics does not allege that the Kattawars orally promised one thing and agreed to something different in a written contract and then failed to deliver what they had orally promised. Logistics alleges that the Kattawars made certain false statements about Eagle and its finances to induce Logistics to change its position in reliance on the false statements and purchase the company. Therefore, the Kattawars' argument on this point is unconvincing, and their Motion to Dismiss is **DENIED** as to this issue.

### III. Fraudulent Misrepresentation/Omission or Fraudulent Concealment

The third issue presented is whether the Counterclaim has stated a claim for fraudulent misrepresentation/omission or fraudulent concealment. As an initial matter, the Court notes

---

[31] *Twombly*, 550 U.S. at 555, 570.

[32] *Gibbons v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, no. 14-cv-586, 2015 WL 789694, at *7 (D. Nev. Feb. 25, 2015) (citations omitted).

[33] *Rd. & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377, 381 (Nev. 2012).

some discrepancy on this point between the heading used in the Counterclaim and the actual allegations of the Counterclaim. Logistics has labelled its cause of action as one for "fraudulent misrepresentation/omission;" however, as more fully explained below, the allegations of the Counterclaim are consistent with the wholly separate and distinct claim of fraudulent concealment. Despite the label Logistics has attached to its claim, the Counterclaim refers to the Kattawars' concealment of material facts, their duty to disclose the facts, and their breach of that duty, all of which are elements of fraudulent concealment. By contrast, the Counterclaim has not actually stated the elements of fraudulent misrepresentation/omission.[34] Therefore, the Court holds that any claim for fraudulent misrepresentation/omission is subject to dismissal.

To establish a claim for fraudulent concealment under Nevada law, a plaintiff must show that (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; that is, the defendant concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than it would have if it had known the fact; (4) the plaintiff was unaware of the fact and would have acted differently if it had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages.[35] In support of their Motion to Dismiss, the Kattawars

---

[34] To make out a claim for fraudulent misrepresentation, a plaintiff must show "(1) a false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).

[35] *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1154 (9th Cir. 2005) (citing *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 110 (Nev. 1998), *overruled in part on other grounds, GES, Inc. v. Corbitt,* 21 P.3d 11 (Nev. 2001)).

argue that they had no duty to make any disclosures to Logistics, thereby precluding a claim for fraudulent concealment. The Court agrees.

Under Nevada law, "[a] duty to disclose may arise when a fiduciary relationship exists between the parties or where the parties enjoy a 'special relationship,' that is, where a party reasonably imparts special confidence in the defendant and the defendant would reasonably know of this confidence."[36] Nevada has recognized the following kinds of "special relationships" which create a duty to disclose: real estate agent/vendor-buyer relationship, where the agent has superior knowledge,[37] an insurer-insured relationship,[38] a trustee-beneficiary relationship,[39] and an attorney-client relationship.[40] Generally, a vendor-vendee relationship where two companies enter into an arms-length transaction will not, as a matter of law, create a special relationship and attendant duty to disclose.[41] Applying this black-letter law to Logistics's fraudulent concealment claim, Logistics has alleged nothing more than a vendor-vendee relationship between the parties. The parties did not have a "special relationship," and so

---

[36] *Ace Am. Ins. Co. v. Hallier*, no. 14-cv-00703, 2015 WL 1326499, at *3 (D. Nev. Mar. 25, 2015) (citing *Weingartner v. Chase Home Fin., LLC,* 702 F. Supp. 2d 1276, 1288 (D. Nev. 2010); *Peri & Sons Farms, Inc. v. Jain Irrigation, Inc.*, 933 F. Supp. 2d 1279, 1294 n.14 (D. Nev. 2013)).

[37] *E.g. N. Nev. Mobile Home Brokers v. Penrod*, 610 P.2d 724 (Nev. 1980).

[38] *Ainsworth v. Combined Ins. Co. of Am.*, 774 P.2d 1003 (Nev. 1989).

[39] *Riley v. Rockwell*, 747 P.2d 903 (Nev. 1987).

[40] *Foley v. Morse & Mowbray*, 848 P.2d 519 (Nev. 1993).

[41] *Hallier*, 2015 WL 1326499, at *3; *Peri & Sons Farms*, 933 F. Supp. 2d 1279 at (D. Nev. 2013); *Weingartner*, 702 F. Supp. 2d at 1288; *Nev. Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1416 n.3 (D. Nev. 1995) ("This was nothing more than a straightforward commercial transaction between two corporations for the purchase of electrical equipment. The relationship here, such as it was, was simply that of vendor-vendee.").

Kattawars had no duty to disclose any of the information forming the basis of the fraudulent concealment claim.

Logistics argues that the Counterclaim alleges the existence of a duty and the duty to disclose was contractual in nature. The Court finds this argument persuasive. Courts applying Nevada law treat the duty to disclose as a question of law and have specifically held no such duty attaches to an arms length business transaction.[42] It follows that the Counterclaim's allegation about the existence of a duty to disclose is a legal conclusion. For purposes of a Rule 12(b)(6) motion to dismiss, the Court need not accept a legal conclusion as true. And Logistics cites no Nevada precedent to support its theory that a contract can give rise to a special relationship between the parties and fiduciary duty to disclose. Therefore, the Kattawars' Motion to Dismiss is **GRANTED** as to this issue.

## IV. Declaratory Relief

The final issue raised by the Kattawars' Motion to Dismiss concerns Logistics's claims for declaratory relief. The Counterclaim alleges two separate causes of action for declaratory relief (Counts 7 and 8) and seeks a "judicial determination of the respective rights and duties" of the parties under the consulting agreements. The Kattawars seek dismissal of the claims, arguing that under Nevada law declaratory relief is a remedy and not a substantive claim. As a result, the Court should dismiss both of the counts for declaratory relief. The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that the federal courts "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such

---

[42] *Peri & Sons Farms*, 933 F. Supp. 2d at 1293-94 ("[A] straightforward vendor-vendee relationship, . . . *as a matter of law*, creates no fraud-based duty to disclose.") (emphasis added); *Weingartner*, 702 F. Supp. 2d at 1288 (D. Nev. 2010) ("*As a matter of law*, lenders are not agents or fiduciaries of a borrower.") (emphasis added).

declaration."[43]  Rule 57 of the Federal Rule of Civil Procedure specifies that the Federal Rules "govern the procedure for obtaining a declaratory judgment."[44] "[A] declaratory judgment action is a procedural device used to vindicate substantive rights" but is not itself a substantive claim for relief.[45]  The Kattawars' point about the nature of the Counterclaim's separately pleaded causes of action for declaratory relief is well taken.  But in this case the Court finds it unnecessary to dismiss Logistics's claims for declaratory relief.  The Court finds that Logistics has filed "an appropriate pleading" and that the Counterclaim puts the Kattawars on notice that Logistics seeks a "judicial determination of the respective rights and duties" of the parties in their contracts.  The fact that Logistics might have cited the Declaratory Judgment Act or simply included the declaratory relief among the other forms of relief listed in its prayer does not require dismissal of the claims.  Therefore, the Kattawars' Motion to Dismiss is **DENIED** as to this issue.

## V. Leave to Amend the Counterclaim

In its response brief, Logistics has made only a passing request for leave to amend its pleadings to correct any defect in its Counterclaim.  The Court declines to address this request at this time.  The Sixth Circuit has held that a motion for leave to amend the pleadings under Rule 15(a) is governed by Rule 7(b), which states that a motion "shall state with particularity the grounds for seeking the order."[46]  Where a party seeking leave to amend does so "in a single

---

[43] 28 U.S.C. § 2201(a).

[44] Fed. R. Civ. P. 57.

[45] *Int'l Ass'n of Machinists & Aerospace Workers v. T.V.A.*, 108 F.3d 658, 668 (6th Cir. 1997); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014) (holding that "the operation of the Declaratory Judgment Act" is "procedural" only and leaves "substantive rights unchanged").

[46] *Evans v. Pearson Enter., Inc.*, 434 F.3d 839, 853 (6th Cir. 2006) (citations omitted).

sentence without providing grounds or a proposed amended complaint to support" the request, the Sixth Circuit has held that the party fails to state the grounds for relief with particularity.[47] More specifically, "a bare request in an opposition to a motion to dismiss . . . without any indication of the particular grounds on which amendment is sought" is insufficient.[48] The Court finds that Logistics' "bare request" is inadequate as a motion for purposes of Rules 7(b) and 15(a). The Court will grant Logistics 30 days from the entry of this order in which to file a proper motion to amend its Counterclaim.

## CONCLUSION

The Kattawars' Motion to Dismiss Logistics's counterclaims for breach of the implied covenant of good faith and fair dealing and claim for fraudulent misrepresentation/omission and/or fraudulent concealment is **GRANTED**. The Motion to Dismiss Logistics's counterclaims for fraud in the inducement and for declaratory relief is **DENIED**.

**IT IS SO ORDERED.**

s/ **S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: June 8, 2015.

---

[47] *Id.*
[48] *Id.* (citing *Confederate Mem. Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993)).